## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| DORMITUS BRANDS LLC,<br>An Illinois Limited Liability Company,<br><br>*Plaintiff*,<br><br>v.<br><br>AT&T MOBILITY LLC,<br>A Delaware Limited Liability Company,<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)   Civil Action No. 14-7394<br>)<br>)<br>)<br>)   **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>) |

### COMPLAINT FOR DECLARATORY JUDGEMENT

**PLAINTIFF DORMITUS BRANDS LLC** ("Dormitus" or the "Plaintiff"), by its counsel THE GIOCONDA LAW GROUP PLLC and MAVRAKAKIS LAW GROUP LLP hereby complains and alleges against **DEFENDANT AT&T MOBILITY LLC** ("AT&T" or the "Defendant"), as follows:

### NATURE OF THE ACTION AND FACTUAL BACKGROUND

1.      This is a Declaratory Judgment case centering on AT&T's improper attempt to continue to monopolize the Cingular trademarks that it commercially and legally abandoned years ago.

2.      The principal of Dormitus Brands LLC is Mark Thomann, a successful entrepreneur who revives distressed, abandoned brands that were discarded into the dustbin of history and revitalizes them, typically introducing branded products or services distinct from the products or services historically associated with the brands.

3.     For example, the Plaintiff's principal has successfully re-established brands of yesteryear such as BRIM®, COLECO®/COLECOVISION®, CROSS COLOURS®, SALON SELECTIVES®, NUPRIN®, IPANA®, RIVAL®, CLEARLY CANADIAN®, NOT ALL SNACKS ARE CREATED EAGLE®.

4.     Once the Plaintiff's principal owns rights to a distressed brand that he acquires or one that has been abandoned/discarded, he will implement a number of different strategies to invest in it, from investing in an operating entity or licensing and cultivating supplier relationships to creating retail alliances.

5.     The Plaintiff will deploy and engage a range of commercial resources to help an old brand succeed and have a chance at a second life.

6.     These efforts run the gamut from helping engage world-class creative and strategic support, to the recruitment of expert advisors and Board members, to active involvement in the sourcing of additional capital to fuel growth and achieve commercialization.

## BRAND REVIVAL

7.     U.S. trademark laws and industry practices encourage and stimulate healthy, fair competition, wherein the public can receive products and services under an abandoned brand, under new management.

8.     There are dozens of prominent examples where dormant brand and trademark rights have been revived.  *See, e.g.,* Intellectual Asset Management, "The real zombies exist solely on the books," July/August 2010 (Exhibit 1).

9.     Examples include brands that were abandoned/ceased and revived, such as WHITE CLOUD®, POLAROID®, PUMA®, SHARPER IMAGE®, MOSSIMO®, COLECO®

(revived by the Plaintiff's principal); VOLKSWAGEN BEETLE®, PABST BLUE RIBBON®, NUPRIN®, INDIAN MOTORCYCLE®, OVALTINE® and BRECK SHAMPOO®.  *Id*. at 2.

10.      Such brand revivals "generate new economic activity, and provide consumer choice."  *Id.* at 2.

11.      A classic case in point is WHITE CLOUD®-brand toilet tissue.

12.      White Cloud was originally a brand of toilet tissue introduced by third party Procter & Gamble in 1934.

13.      Sometime in 1992, Procter & Gamble intentionally discontinued using the brand in commerce in the United States.

14.      At the time, White Cloud was the number 7 toilet paper in the United States, but Procter & Gamble abandoned it to focus on Charmin, the nation's largest-selling toilet paper. *See, e.g*., Chicago Tribune, "Reviving the Past," May 2, 2006 (Exhibit 2).

15.      In 1995, third party Paper Partners LLC had filed an Intent-to-Use Trademark Application in the United States Patent and Trademark Office ("USPTO") after the 3-year consecutive period of non-use had elapsed.

16.      Today, Paper Partners' White Cloud has achieved great success as a trademark of toilet tissue sold exclusively through third party Wal-Mart's stores.  *See, e.g.,* Consumer Reports, "Attention Walmart shoppers! White Cloud toilet paper is tops," June 18, 2013 (Exhibit 3).

17.      Consumers benefit from having a revived brand made available again.

18.      The Economist has recently reported on the benefits of this approach:

…[R]ediscovering and restoring a neglected brand, tapping into consumers' fond memories of times gone by, is surely a cost-effective way of competing in a marketing landscape where start-up costs are prohibitive and the chances of failure are high.  If capitalism is a system of creative destruction, in Joseph Schumpeter's famous phrase, it is a system of creative reconstruction as well.

3

The Economist, "Hidden Gems: Reviving old brands sometimes makes more sense than creating new ones," April 12, 2014 (Exhibit 4).

19.     On information and belief, Defendant AT&T is well-aware of this lawful practice, and has undertaken similar activities itself when it revived the name "AT&T" when coining "AT&T Wireless." *See* 2006 AT&T Press Release dated December 29, 2006 (Exhibit 5).

**AT&T UNMISTAKABLY
ABANDONED THE CINGULAR MARKS
IN THE MARKETPLACE**

20.     In a 2005 interview with USA Today, Ed Whitacre, the former CEO of AT&T, "left no doubt about his plans. ***Asked if the company planned to drop the Cingular name in favor of the AT&T brand, Whitacre said, 'Yes, we do.'*** *See* USA Today, "Cingular Will Be Sold Under Name of AT&T," November 20, 2005 (Exhibit 6) (emphasis added). In late 2006, AT&T acquired all legal rights to the Cingular Marks.

21.     On information and belief, AT&T carefully considered all of its various options and deliberately and intentionally chose to abandon the Cingular Marks. *Id*.

22.     Beginning in January 2007, in the most publicized and successful act of commercial trademark abandonment in recent history, it was widely reported in the news media that the Defendant AT&T "***will begin to extinguish next week the brand of cellphone operator Cingular***, built up with billions of dollars over a few years, to imprint its more-than-century-old name firmly across its services." Reuters, "***AT&T to phase out Cingular***, reclaim wireless brand," January 12, 2007 (Exhibit 7) (emphasis added); *see also* "***Goodbye Cingular***, Hello to the New Bell, AT&T," The New York Times, May 21, 2007 (Exhibit 8) ("*AT&T is finally saying goodbye to Cingular for good*.") (emphasis added).

4

23.     On January 12, 2007, AT&T publicly announced its major rebranding transition campaign to totally transition the Cingular Marks to "the New AT&T." *See* 2007 AT&T Press Release, "Cingular is Now the New AT&T," January 12, 2007 (Exhibit 9). Beginning in January 2007, AT&T launched the complete phase-out of the Cingular brand to AT&T in television advertising and customer communications by creating "Cingular is now The New AT&T" logos (Exhibit 10).

24.     On information and belief, AT&T did so because the benefits of having all of its products under the single, famous AT&T brand significantly outweighed the costs of maintaining products or services under the Cingular brand. *See, e.g.,* USA Today, January 17, 2007 (Exhibit 14) ("***AT&T expects to save about $2.8 billion*** in operating expenses by marketing services with just the AT&T brand.") (emphasis added); Wall Street Journal, "Bye, Cingular, in AT&T Rebranding," Jan. 12, 2007 (Exhibit 11); ("[E]xecutives estimate 20% of the expected operating-expense savings from the merger will come from advertising, because of the single AT&T brand."); CBS News (Exhibit 12) ("AT&T expects tremendous savings on the advertising that would have been required to maintain three distinct brands…executives estimated the combined company would save up to a half billion dollars a year on marketing. Overall, those savings are expected to account for a fifth of the estimated $14 billion in operational savings the deal is projected to allow over time.").

25.     By mid-April 2007, AT&T began to introduce new AT&T-branded mobile phones and devices.

26.     Also on or about April 15, 2007, the alpha tag (the portion of the phone's screen which displays the name of the network on which the phone is connected) on the Defendant's new phone activations started reading "AT&T" instead of "Cingular."

27.     In mid-May 2007, literally "overnight," the former Cingular stores stripped out all of the Cingular marks and materials.  *See* San Antonio Business Journal, "***AT&T Begins Phase-Out of Cingular Brand*** in Retail Stores," May 21, 2007 (Exhibit 13) ("It's official … Cingular's 1,800 retail wireless stores owned by AT&T, Inc. were rebranded overnight …. All in-store signage, store kiosks and point-of-sale materials at company owned stores have been switched out to the AT&T brand.").

28.     As of May 31, 2007, the former Cingular.com website redirected to ATT.com and no longer featured any Cingular logos or branding whatsoever.

29.     By June 2007, customer service lines began answering Cingular's customer service calls with:  "Thank you for calling The New AT&T about your wireless service."

30.     Additionally by June 2007, all the Defendant's new SIM cards were branded with the AT&T logo, rather than the Cingular Marks.

31.     By June 16, 2007, most of the cellular telephones on the Defendant's network displayed "AT&T" as the carrier, instead of displaying the Cingular Marks.

32.     During 2007, the Defendant legally changed its name from Cingular Wireless LLC to its current name of AT&T Mobility LLC.

33.     Beginning in 2007, AT&T developed and executed a careful plan to ensure its Cingular customers were well informed of the switch from "Cingular" to "AT&T."  *See* Exhibit 9.

34.     AT&T studiously monitored results so that the plan would run long enough that AT&T could be satisfied that its customers would not be confused by the business decision it had made.  *See* Exhibit 18.

35.    Therefore, it is crystal clear that, during the first half of 2007, the Defendant intentionally, publicly, decidedly and unmistakably placed all of its wireless telephone service offerings and products under the famous AT&T brands rather than the Cingular Marks.

36.    On information and belief, the Defendant spent significant sums of money and devoted considerable AT&T human resources toward moving quickly and decisively away from the Cingular Marks to the AT&T brands, and have benefitted greatly thereby.

37.    There was never any question in the news media or in consumers' minds that the Cingular Marks were being commercially abandoned by AT&T.  *See, e.g.,* Exhibits 6 to 19; *see also* (emphasis added in each):  USA Today, "*AT&T Plans Ads to Phase Out Cingular*," January 17, 2007 (Exhibit 14); AdWeek, "*Cingular Brand Set to Vanish*," May 2, 2006, (Exhibit 15); CBS News, "From AT&T to Cingular and Back Again," January 12, 2007 (Exhibit 12); and NPR, "*AT&T To Phase Out Cingular Name*," January 12, 2007 (Exhibit 16).

38.    In fact, media reports demonstrated that AT&T actually *accelerated* its plans to abandon the Cingular Marks in mid-2007, ahead of an Apple iPhone launch.  *See* Advertising Age, "*AT&T Phases Out Cingular Faster than Expected*," May 21, 2007 (Exhibit 17) (emphasis added); Arkansas Business, "*AT&T:  So Long, Cingular,* Hello, Unified Brand," May 28, 2007 (Exhibit 18) (emphasis added).

39.    AT&T's website currently describes that it intentionally chose to transition away from the Cingular mark completely to the AT&T name and logo in 2006 and going forward.  *See* AT&T's "Cingular Timeline" (Exhibit 19).

40.    The Defendant admits that it now markets itself under the AT&T name and logo, and has changed its legal name to AT&T Mobility LLC.  Exhibit 21 at ¶ 12.

41.     By mid-2010, at least three (3) successive years had elapsed since the Defendant had used the Cingular Marks in *bona fide* commerce in the United States.

42.     The Cingular brand is now described historically as a brand that has "***just vanished***."  Yahoo! Finance, "Iconic Brands That Just Vanished," July 3, 2013 (Exhibit 20) (emphasis added).

## AT&T ALSO CHOSE TO LEGALLY ABANDON
## ALL THE CINGULAR MARKS IN THE USPTO

43.     Beginning in 2008, the USPTO began to require that AT&T file proper Statements of Use under Section 8 and submit proper Specimens of Use, or else risk losing its multiple federal trademark registrations for the Abandoned Cingular Marks.

44.     A Section 8 Declaration of Continued Use is a sworn statement, filed by the owner of a trademark registration, attesting that the mark is in use in commerce.  15 U.S.C. § 1058.

45.     By 2009, because AT&T failed to file Declarations of Use or Excusable NonUse, each one of the trademark registrations for the Abandoned Cingular Marks began to be officially cancelled by the USPTO pursuant to 15 U.S.C. § 1058.

46.     During the years 2009 to 2014, no less than thirteen (13) federal trademark registrations could have been renewed by the Defendant, if it had been in fact, making *bona fide* commercial use of the Trademarks.

47.     AT&T did not appeal or otherwise object to the USPTO's cancellation of the Abandoned Cingular Marks.

48.     By May 16, 2014, every single one of AT&T's trademark registrations in the Abandoned Cingular Marks was officially cancelled by the USPTO because AT&T did not file any sworn Statements of Use or Declarations of Excusable NonUse, as required by law.

49.     Consequently, every single one of AT&T's Abandoned Cingular Marks is now deemed "DEAD" by the USPTO, and has been officially cancelled:

| U.S. Trademark Registration Number | Mark | Int'l Classes | Date USPTO Cancelled Registration | Current Status |
|---|---|---|---|---|
| 2,714,588 | CINGULAR NATION | 38 | Dec. 12, 2009 | DEAD, CANCELLED |
| 2,714,589 | CINGULAR REGION | 38 | Dec. 12, 2009 | DEAD, CANCELLED |
| 2,726,862 | CINGULAR PROMISE | 38 | Jan. 23, 2010 | DEAD, CANCELLED |
| 2,784,954 | CINGULAR HOME | 38 | June 26, 2010 | DEAD, CANCELLED |
| 2,806,289 | CINGULAR ROLLOVER | 38 | Aug. 27, 2010 | DEAD, CANCELLED |
| 2,808,453 | CINGULAR WIRELESS | 9, 16, 35, 36, 37, 42 | Sept. 3, 2010 | DEAD, CANCELLED |
| 2,871,582 | cingular WIRELESS | 9, 16, 35, 36, 37, 42 | Mar. 11, 2011 | DEAD, CANCELLED |
| 3,006,878 | CINGULAR FITS YOU BEST | 9, 35, 38 | Sept. 21, 2012 | DEAD, CANCELLED |
| 3,006,877 | cingular fits you best | 9, 35, 38 | Sept. 21, 2012 | DEAD, CANCELLED |
| 3,049,127 | CINGULAR TAKE CHARGE | 38 | Oct. 12, 2012 | DEAD, CANCELLED |
| 3,083,428 | CINGULAR SMARTCHIP | 9, 38 | Nov. 23, 2012 | DEAD, CANCELLED |
| 2,596,041 | CINGULAR | 9, 16, 35, 36, 38, 42 | June 21, 2013 | DEAD, CANCELLED |
| 3,308,524 | CINGULAR SOUNDS | 38 | May 16, 2014 | DEAD, CANCELLED |

**The Plaintiff's Principal Filed Two Good Faith Intent-to-Use Trademark Applications
That AT&T Has Now Opposed**

50.     On January 30, 2014, after nearly seven (7) years of consecutive non-use by the

Defendant, the Plaintiff's principal filed two (2) separate Intent-to-Use ("ITU") Applications for

two of the Abandoned CINGULAR Marks in the USPTO, Serial No. 86/179,822 for the

"CINGULAR" word mark in IC 9, and Serial No.  86/223,138 for  in IC 9 (the

"Intended Cingular Marks") by filing all necessary fees and submitting all required disclosures[1].

51.     These two Intent-to-Use Applications were based upon the Plaintiff's principal's

*bona fide* intent to use the Intended Cingular Marks in commerce in the United States.

52.     The USPTO, upon determining that no confusingly similar registered or pending

marks exist on the Principal or Supplemental Register, concluded that there were no pre-existing

marks likely to cause confusion with the Intended Cingular Marks.

53.     The USPTO approved both of Plaintiff's applications for the Intended Cingular

Marks for publication in the Official Gazette.

54.     The Plaintiff's Intended Cingular Marks were published in the Official Gazette on

or about July 8 and 15, 2014.

55.     The Plaintiff was legally entitled under the trademark laws of the United States to

use the Intended Cingular Marks in commerce and register them on the Principal Register, as

these same marks have been commercially and legally abandoned by AT&T.

56.     Nonetheless, on August 29, 2014, AT&T filed formal Oppositions to the

Plaintiff's Applications for the Intended Cingular Marks in the Trademark Trial and Appeal

Board.  *See* Exhibit 21.

---

[1] The Intended Cingular Marks and all related rights were subsequently assigned to the Plaintiff.

57. Glaringly absent from AT&T's Oppositions are any allegation that these marks are currently being used in commerce by AT&T in a *bona fide* manner, and no allegations that AT&T currently intends to resume their use in commerce in the United States.

58. Rather, AT&T alleges that it is solely concerned about undocumented and theoretical residual association between AT&T and the Abandoned Cingular Marks that it was so eager to abandon over seven (7) years ago.

59. But after 3 consecutive years of non-use of the Cingular trademarks in commerce, by mid-2010, a *prima facie* case of abandonment was already established.

60. After 7 years, by mid-2014, the Defendant did not own a single federally registered trademark in the Cingular Marks in the United States.

61. The Defendant does not currently own a single federally registered trademark for the Abandoned Cingular Marks in the United States.

62. Therefore, the Plaintiff was legally entitled to receive a registration on the Principal Register for the Cingular Marks and begin using the Intended Cingular Marks, without risk of proper objection or obstruction from AT&T.

63. Nonetheless, AT&T has firmly and formally alleged that "[e]ven though [AT&T] now markets itself under the AT&T name and logo, and has changed its legal name to AT&T Mobility LLC, the fame and reputation of the Cingular name, combined with [AT&T's] co-branding of the Cingular and AT&T names, has resulted in the consuming public still associating the Cingular name and logo with [AT&T]." *Id.* at ¶ 12.

64. Further, AT&T specifically and falsely accused the Plaintiff's principal of "a deliberate attempt to misrepresent and the source of his goods and trade on AT&T's Identity." *Id*. AT&T has created a reasonable apprehension of imminent suit against the Plaintiff's

principal by alleging that: "[AT&T] will be irreparably injured and damaged *if Applicant is permitted to use and register* the Opposed Marks for the goods identified in the subject applications, because the purchasing public will presume that Applicant is connected to [AT&T] within the meaning of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a) related to the prohibition of allowing registrations to issue that may falsely suggest a connection with an institution." *Id.* at ¶ 20. (emphasis added).

65.     Further, AT&T alleges that "[i]n addition, [AT&T] will be irreparably injured and damaged *if Applicant is permitted to use and register* the Opposed Marks for the goods identified in the subject applications, because Applicant will use the Opposed Marks to misrepresent to the purchasing public that [AT&T] is the source of his goods within the meaning of Section 14(3) of the Lanham Act, 15 U.S.C. § 1064(3). [AT&T] has no control over the nature and quality of the goods provided by Applicant under the Opposed Marks and thus will be damaged and irreparably harmed by reason of the loss of control over its reputation and the erosion of goodwill in [AT&T's] Identity." *Id.* at ¶¶ 21-22. (emphasis added).

66.     Consequently, the Plaintiff cannot proceed with using, commercializing, licensing or registering the Intended Cingular Marks without continued litigation and unlawful interference from AT&T including AT&T's thinly-veiled threat to pursue remedies for its purported "irreparable injuries" and "damages."

67.     The Plaintiff was legally entitled to receive a registration on the Principal Register for the Cingular Marks, without risk of proper objection or obstruction from AT&T.

68.     This deliberate obstruction has impacted the Plaintiff, as it cannot proceed with various commercial opportunities that it was in the process of exploring to commercialize the Intended Cingular Marks.

69.     The Plaintiff therefore respectfully seeks a Declaratory Judgment that the Intended Cingular Marks do not violate any valid, alleged trademark rights asserted against it by the Defendant, would create no likelihood of consumer confusion with any of the Defendant's existing valid or enforceable trademark rights, would not constitute unfair competition with AT&T and would not constitute actionable dilution of any claimed valid trademark or other legal right owned by AT&T.

## PARTIES AND JURISDICTION

70.     **PLAINTIFF DORMITUS BRANDS LLC** is a limited liability company with a principal place of business at 300 North LaSalle, Suite 4925, Chicago, IL 60654 and is organized under the laws of the State of Illinois.  The Plaintiff resides in the United States, in Illinois and in this Judicial District.  The sole member of the Plaintiff is Mark Thomann, an Illinois resident and citizen.  Both ITU's at issue have been assigned to the Plaintiff by Mr. Thomann.

71.     **DEFENDANT AT&T MOBILITY LLC** is a limited liability company with a principal place of business at 1025 Lenox Park Blvd. NE, Atlanta, GA 30319.  The Defendant regularly does business in Illinois and this Judicial District.

72.     This is an action for Declaratory Judgment arising under (i) the Trademark Laws of the United States, namely, 15 U.S.C. § 1051 *et seq*., and 15 U.S.C. § 1121 *et seq*.; (ii) the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and (3) Rule 57 of the Federal Rules of Civil Procedure.  Thus, this Court has original jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §§ 1331 and 1338.

73.     This Court has personal jurisdiction over the Defendant as it has regularly transacted business in Illinois, regularly done or solicited business in Illinois.  Further, the Defendant's conduct will cause injury to the Plaintiff in Illinois and this Judicial District.  Venue in this District is, therefore, proper under 28 U.S.C. § 1391 *et seq*.

## FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT OF
### TRADEMARK ABANDONMENT, INVALIDITY, NON-INFRINGEMENT
### NO UNFAIR COMPETITION AND NO DILUTION

74.     The Plaintiff reinstates and realleges paragraphs 1 through 73 inclusive, as if fully set forth herein.

75.     The Defendant's Abandoned Cingular trademarks and trade dresses were abandoned under the applicable provisions of the Lanham Act, 15 U.S.C. § 1127, Lanham Act § 45.

76.     The Defendant AT&T has clearly alleged that the use and registration by Plaintiff of its Intended Cingular Marks on products or services and in advertising, would be and is an infringement of AT&T's claimed rights in the Abandoned Cingular Marks, and would constitute unfair competition.

77.     AT&T currently owns no valid or enforceable federal trademark registrations on the Abandoned Cingular Marks.

78.     The Plaintiff is entitled to receive federal trademark registrations for the Intended Cingular Marks, as such federal registrations confer benefits to the Registrant against others.

79.     For example, infringement of a registered trademark is actionable under the Lanham Act, 15 U.S.C. § 1114(1), which permits a Registrant to commence a civil action in U.S. District Court to obtain, inter alia, injunctive relief to prevent violation of any such rights, 15 U.S.C. § 1116; and monetary relief including profits attributable to the infringement, *Id*. at § 1117. Allegations of unregistered trademark or trade dress infringement and unfair competition are actionable under the Lanham Act, with the same relief available. *Id*.

80.     The formal Oppositions filed in the TTAB constitute a clear, unambiguous claim that the Plaintiff's intended sale of goods and services under the Intended Cingular Marks and trade dress would be an infringement of AT&T's claimed rights and would lead to litigation by AT&T.

81.     The Plaintiff denies that its good faith intended use of the Intended Cingular Trademarks does, or will create any likelihood of confusion with AT&T's existing trademarks or its products.

82.     The unreasonable objections of AT&T are intended to disrupt the Plaintiff's lawful business, thereby requiring an adjudication of the rights of the parties in the dispute identified herein, before the Plaintiff suffers further damage.

83.     An actual case or controversy therefore exists within the Court's jurisdiction, concerning the validity of AT&T's claimed trademark and trade dress rights, and the respective rights and obligations of the parties. *See* 28 U.S.C. §§ 2201, 2202; FED. R. CIV. P. 57.

84.     The Plaintiff's Intended Cingular Marks and trade dresses will not cause consumer confusion, do not infringe upon any registered trademark or unregistered claimed

16

trademark or dress rights owned by AT&T, do not constitute unfair competition and do not dilute any famous trademarks or trade dresses owned by AT&T.

85.     Plaintiff has no adequate remedy at law and therefore seeks declaratory relief as set forth herein.

## SECOND CAUSE OF ACTION

## DECLARATORY JUDGMENT OF TRADEMARK UNENFORCEABILITY

86.     The Plaintiff reinstates and realleges paragraphs 1 through 85 inclusive, as if fully set forth herein.

87.     Defendant AT&T has formally alleged that the use and sale by Plaintiff of its Intended Cingular Marks on products or services and in advertising, would be and is an infringement of AT&T's claimed rights and would constitute unfair competition and "passing off" of the Plaintiff's goods and services as those of AT&T.

88.     The formal Oppositions filed by AT&T in the TTAB against the Plaintiff's ITU's constitute a clear, unambiguous claim that the Plaintiff's sale of goods and services under its Intended Cingular Marks would be an infringement of AT&T's claimed trade dress, trademark and common law rights and constitute unfair competition.

89.     The Plaintiff has denied that its good faith sale of items and services incorporating the Intended Cingular Marks does, or will create any likelihood of confusion with AT&T's existing trademarks or its products, or unfairly compete with AT&T.

90.    The unreasonable objections of AT&T are intended to disrupt the Plaintiff's lawful business, thereby requiring an adjudication of the rights of the parties in the dispute identified herein, before the Plaintiff suffers further damage.

91.    An actual case or controversy therefore exists within the Court's jurisdiction, concerning the validity and enforceability of AT&T's claimed trademark and trade dress rights, and the respective rights of the parties. *See* 28 U.S.C. §§ 2201, 2202; FED. R. CIV. P. 57.

92.    The Defendant's Cingular Marks are unenforceable against the Plaintiff because of its conduct.

93.    Plaintiff has no adequate remedy at law and therefore seeks declaratory relief as set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Dormitus Brands LLC prays that this Court:

A.    A Declaration of the Plaintiff's lawful rights to sell products and services in connection with the Intended Cingular Marks without further complaint or interference from AT&T;

B.    A Declaration that the Plaintiff's Intended Cingular Marks and related trade dresses do not infringe upon any of AT&T's valid trademarks or claimed unregistered trademark or trade dress rights or dilute the same;

C.    A Declaration that the Plaintiff's anticipated sale of products and services in connection with the Intended Cingular Marks does not create a likelihood of consumer confusion

with any of AT&T's registered or unregistered trademarks or with any common law rights of AT&T in the unregistered trademarks or trade dress of its products or services;

D.       An Order directing the Commissioner of Trademarks to terminate the Defendant's Oppositions to the Plaintiff's Intended Cingular Marks;

E.       A Declaration that this is an "exceptional case" and an award of the Plaintiff's attorneys' fees and costs under 15 U.S.C. § 1117; and

F.       Such other and further relief as this Court shall deem necessary and appropriate.

**<u>A TRIAL BY JURY DEMAND</u>**

.

Dated: September 23, 2014          Respectfully submitted,

*/s/ James A. Shimota*
James A. Shimota

James A. Shimota (IL Bar No. 6270603)
MAVRAKAKIS LAW GROUP LLP
180 North LaSalle Street, Suite 2215
Chicago, Illinois 60601
Telephone: 312-216-1626
Facsimile: 312-216-1621
jshimota@bridgesmav.com

Joseph C. Gioconda (JG4716)
GIOCONDA LAW GROUP PLLC
One Penn Plaza, 36th Floor
New York, NY 10119-0002
Telephone: (212) 786-7549
Facsimile: (888) 697-9665
joseph.gioconda@giocondalaw.com

Bell Plaza, Suite 607
42-40 Bell Boulevard
Bayside, NY 11361
Telephone: (718) 423-3610

(Admission *Pro Hac Vice* Pending)

*Attorneys for Plaintiff Dormitus Brands LLC*